*Ruling. OP*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2005 JUL 26  P 3: 20

-------------------------------------------------------x

RANDALL E. SMITH, SR., PLAINTIFF       :      NO. 3:04 CV 782 (JBA)

v.                                    :

JO ANNE B. BARNHART COMMISSIONER,   :
SOCIAL SECURITY ADMINISTRATION     :

                                        :      DATE: JULY 26, 2005

-------------------------------------------------------x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND ON DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE
COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision, by the Commissioner of Social Security ["the Commissioner"], that denied plaintiff Disability Insurance Benefits ["DIB"].

I. ADMINISTRATIVE PROCEEDINGS

On April 11, 2001, plaintiff filed an application for DIB.  (See Certified Transcript of Administrative Proceedings, filed July 16, 2004 ["Tr."] 77-79, 14).  The application was initially denied on June 26, 2001.  (See Tr. 26, 28-31).  On July 27, 2001, plaintiff filed a request for reconsideration (See Tr. 32) and on September 22, 2001, the denial of benefits was affirmed.  (See Tr. 33-36).  On November 6, 2001, the Social Security Administration ["SSA"] received a timely-filed request for a hearing before an Administrative Law Judge ["ALJ"], regarding the April 11, 2001 application.  (See Tr. 37).  A hearing was held on August 5, 2002, and a supplemental hearing was held on May 20, 2003 before ALJ Roy Liberman.  (See Tr. 14, 437-85).  Plaintiff was represented by counsel at both hearings (see Tr. 437, 439, 457, 459) and testified at both hearings. (See Tr. 14, 440-55, 467-70). Dr. Courtney Olds, a vocational expert, testified at the supplemental hearing.  (See Tr. 14, 461-67, 47-78, 480-85.  See also Tr. 69-76).

AO 72A
(Rev. 8/82)

On December 19, 2003, ALJ Liberman issued his decision finding that plaintiff did not meet disability insured status because the severity of plaintiff's impairments, individually and in combination, do not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 404 ["Listing"].  (See Tr. 14-22, 16, 21).  Plaintiff was found to have the residual functional capacity for all exertional activity, except repetitive use of the hands and lifting and carrying over five pounds.  (See Tr. 19-21).  ALJ Liberman also found that plaintiff has no transferable skills from any past relevant work.  (See Tr. 19, 21).  ALJ Liberman's decision, however, also found that there are jobs existing in significant numbers in the national economy that plaintiff could perform, and thus plaintiff was found not to be under a "disability" as defined in the Social Security Act.  (See Tr. 20-21).

Plaintiff thereafter appealed the ALJ's decision on February 17, 2004.  (See Tr. 8-10).  Plaintiff's request for review was denied by the Appeals Council on April 30, 2004, rendering the ALJ's decision, dated December 19, 2003, the final decision of the Commissioner of Social Security.  (See Tr. 5-7).

On May 11, 2004, plaintiff commenced litigation in this Court to reverse the adverse decision of the Commissioner.  (Dkt. #1).  On July 16, 2004, defendant filed her Answer.  (Dkt. #4).[1]  Pending before the Court is plaintiff's Motion for Summary Judgment or, Alternatively, an Order of Remand, filed November 5, 2005 (Dkts. ##11-12, 15; see also Dkt. #13), and defendant's Motion for Order Affirming the Decision of the Commissioner and in Opposition to Remand, filed December 9, 2004.  (Dkt. #14). On February 28, 2005, United States District Judge Janet Bond Arterton referred the file to this Magistrate Judge.  (Dkt. #16).

For the reasons stated below, plaintiff's Motion for Summary Judgment (Dkt. #11) is

---

[1]Attached to defendant's Answer is a certified copy of the transcript of the record, dated June 12, 2004.

AO 72A
(Rev. 8/82)

<u>granted in part to the extent that a limited remand is ordered</u> and defendant's Motion for an Order Affirming the Decision of the Commissioner and In Opposition to Remand (Dkt. #14) is <u>denied</u>.

## II.  FACTUAL BACKGROUND

Plaintiff is a fifty year old[2] male who is married with two children.  (<u>See</u> Tr. 440). Plaintiff attended school through the eighth grade.  (<u>See</u> Tr. 442).  For eighteen consecutive years, plaintiff worked for Yale-New Haven Hospital, first as a part-time sanitation worker and then as a full-time cook, preparing and serving bulk food for hospital patients, for the cafeteria, and for catering services.  (<u>See</u> Tr. at 446-447, 412, 462-63).  As a cook, plaintiff testified that he regularly lifted pots and pans weighing approximately 120 pounds.  (<u>See</u> Tr. 447).  On or about February 12, 1996, plaintiff lifted a two-quart ladle of tomato sauce[3] and injured his right upper extremity while working as a covered kitchen worker at Yale-New Haven Hospital.  (<u>See</u> Tr. 447-48, 221, 245).  Plaintiff sought treatment under workers' compensation for this injury.  (<u>See</u> Tr. 411-18).

On or about February 12, 1996, plaintiff was evaluated by Dr. Scott Wolfe and received treatment for radial nerve injury and recurrent tendinitis of the wrist.  (<u>See</u> Tr. 168, 221).  Dr. Wolfe gave plaintiff a 3% impairment rating for these injuries.  (<u>See</u> Tr. 168, 221). Thereafter, plaintiff was seen by Dr. Grant Thomson[4] for numbness in the left elbow occasionally extending to the fingers, for which Dr. Thomson performed "submuscular transposition of left ulnar nerve and release of medium nerve and ulnar nerve at wrist level"

---

[2]Plaintiff's date of birth is May 25, 1955. (Tr. 26).

[3] "I was lifting two quarts of tomatoes - the last two quarts out of -- of tomato sauce out of a hundred gallon pot. . . . I felt like a pinch in a pole. . . . in the right [arm]." (<u>See</u> Tr. 448).

[4]Dr. Thomson treated plaintiff for numbness and pain in plaintiff's upper extremity from about May 13, 1997 to January 19, 2003.  (Tr. 245, 207-45, 424-26, 431-32, 449).  Dr. Thompson was Director of the Yale Hand Microsurgery Center.  (Tr. 207, 209 -45, 424-26, 437).

AO 72A
(Rev. 8/82)

surgery on July 7, 1997.  (See Tr. 193-94, 449).

Plaintiff was diagnosed with adult-onset diabetes in 1997.  (See Tr. 251, 416.  See also Tr. 249).  On October 20, 1997, plaintiff underwent surgery of the "submuscular transposition right ulnar nerve at elbow," performed by Dr. Thomson.  (See Tr. 191-92, 449).  Plaintiff also underwent "endoscopic release, right carpal tunnel" surgery on February 2, 1998, also performed by Dr. Thomson.  (See Tr. 189-90, 449).  From May 19, 1998 through July 21, 1998, plaintiff attended physical therapy, three to four times a week, at a work hardening center.  (See Tr. 157-67).

In November 1998, plaintiff was examined by Dr. Zeno Chicarilli,[5] who performed an independent investigation for the workers' compensation carrier.  (See Tr. 168-71).  Dr. Chicarilli concluded that plaintiff had a 10% permanent disability of each upper extremity and recommended that he could return to work with a five pound lifting limit.  (See Tr. 170-71).  On January 26, 1999 plaintiff was terminated from Yale-New Haven Hospital for inability to perform his job duties.  (See Tr. 446, 412).  Thereafter, plaintiff worked part-time as a sales person at Kohl's Department Store in Hamden, Connecticut from February 2000 through October 2000, "anywhere from four to twenty-five" hours a week.  (See Tr. 442-43, 412, 462).  Plaintiff testified that his duties consisted of "folding [the] clothes, selling the clothes, [and] help[ing] on the registers when they needed help."  (See Tr. 420, 422, 443).  Plaintiff testified that he did not have to lift anything, besides "clothes off the rack," and that occasionally his arms would go numb.   (See Tr. 443).  Plaintiff stopped working at Kohl's in October 2000 because "[he] needed more surgery on [his] arm."  (See Tr. 443).  Plaintiff has not worked since October 2000.  (See Tr. 412, 445).

On November 30, 2000, plaintiff underwent surgery involving an "open carpal tunnel

---

[5]Dr. Chicarilli, who is a hand surgeon, examined plaintiff on three occasions: November 19, 1998, August 22, 2001 and June 19, 2003.  (See Tr. 168-71, 422-23, 434-36, 455).

release right side with internal neurolysis using the microscope" and "release [of] Guyon's canal right hand" for his recurrent carpal tunnel syndrome in the right hand; the surgery was performed by Dr. Thomson. (See Tr. 181-82, 449). Plaintiff testified that after this surgery, "it got a little bit better, but it did worsen afterwards." (See Tr. 444). Plaintiff was formally discharged from his job at Kohl's after his November 2000 surgery (see Tr. 443-44) because, as plaintiff testified, the company "said the surgery was taking too long and . . . they have a policy or something." (See Tr. 444). Plaintiff testified that he is unsure whether he could have returned to his job at Kohl's. (See id.).

On June 15, 2001, Dr. Thomson examined plaintiff and noted that plaintiff still felt numbness in his hand; Dr. Thomson opined that plaintiff was totally disabled from work. (See Tr. 207). On or about June 22, 2001, plaintiff was examined by an orthopedic surgeon, Dr. Edward Staub. (See Tr. 419-21). Dr. Staub concluded that plaintiff had reached maximum medical improvement and gave plaintiff a 10% permanent disability to the right upper extremity and a 10% permanent partial disability to the left upper extremity. (See Tr. 421).

On August 22, 2001, Dr. Chicarilli performed a followup examination on plaintiff (Tr. 422-23) and diagnosed plaintiff as having a 20% permanent partial disability for his right upper extremity and 10% for his left upper extremity. (See Tr. 423). He also noted that plaintiff had not yet reached maximal medical improvement. (Id.). Dr. Chicarilli recommended that plaintiff would be able to return to light duty sedentary work with a five-pound restriction, with no crawling, lifting overhead, or carrying any objections over five pounds, and with no repetitive activity for his hands. (Id.).

On September 17, 2001, plaintiff was examined by Dr. Audrey Halpern for the Connecticut Disability Determination Services. (See Tr. 398-400). Dr. Halpern concluded that plaintiff has "multiple compression neuropathies . . . , some limitation of range of motion . . . , as well as significant discomfort with paresthesias and pain on strength testing of the

5

hands." (See Tr. 400). Dr. Halpern also concluded that although plaintiff has fairly good fine and gross manipulation, when manipulation against force is used, plaintiff has significant discomfort. (See id.).   On or about December 4, 2001, plaintiff was treated for a lung abscess, which was a service-connected problem from 1975.[6]  (See Tr. 411-12).

On December 7, 2001, plaintiff was examined by Dr. Marvin Arons, a hand surgeon, in order to make a diagnosis and opinion on causation for workers' compensation purposes. (See Tr. 411-18, 455).  Dr. Arons' report concluded that plaintiff's injury is related to his eighteen years of work at Yale-New Haven Hospital and his diabetes has contributed to his outcome and poor prognosis.  (See Tr. 417).

Following an examination on May 8, 2002, Dr. Thomson wrote in this Office Notice, "I have nothing further to offer Mr. Smith." (See Tr. 426, 449).  Dr. Thomson noted plaintiff has been rated as being capable of "medium" work and that "it is necessary for him to take frequent breaks throughout the day." (See Tr. 426).  On January 19, 2003, at the request of counsel for Yale-New Haven Hospital in the workers' compensation matter, Dr. Thomson adjusted plaintiff's impairment rating in accordance with his condition after the November 2000 surgery. (See Tr. 431).  Dr. Thomson set the date of maximum medical improvement as November 22, 2002, and concluded that plaintiff's previous impairment rating combined with numbness and signs of persistent carpal tunnel syndrome put plaintiff at a 53% impairment for his right upper extremity, which can be converted for a total right hand impairment of 59%. (Id.).

On June 19, 2003, Dr. Chicarilli re-evaluated plaintiff for his right hand disability. (See Tr. 434-36).  At this evaluation, Dr. Chicarilli determined that there was no reason to rate plaintiff higher than his previous 38% permanent disability rating to the right hand. (See Tr.

---

[6]Plaintiff is examined semi-annually by Dr. Jeffrey Kravetz at the VA Medical Center.  (See Tr. 156, 451).

AO 72A
(Rev. 8/82)

435). Dr. Chicarilli also gave plaintiff a permanent partial disability of 30% to the right upper extremity, based on strength measurement testing and plaintiff's additional symptomatic complaints. (See id.).

Regarding the activities plaintiff is able to do with his hands, plaintiff testified that he can make sandwiches, take the dog out on a leash, clothe himself, tie his shoes, write for a short time, and drive a standard transmission car for up to an hour. (See Tr. 467-70). Plaintiff testified that his biggest problem is that his arms go numb and he is in pain, "[o]n a constant level, . . . but my pain level is about a four, constant," on a scale of one to ten. (See Tr. 450). Plaintiff testified that when his hands are engaged, the pain goes up to a pain level between six and eight. (See Tr. 450). Plaintiff testified that he encounters problems at various moments including, "writing . . . a letter[,] pushing a button on the remote on the TV . . . [,] doing the dishes . . . [, and] drinking a cup of coffee. . . . And all of a sudden, [my right arm] would go numb. I have burned myself." (See Tr. 450-51).[7] Plaintiff testified that the numbness is mainly in his right arm and he has dropped things and burned himself,[8] but he does not have trouble walking and does "walk around the block" for exercise. (See Tr. 451, 454).

A Physical Capacities Evaluation performed by Dr. Thomson on July 29, 2002 confirmed this ability, as it concluded that plaintiff has the ability to sit, stand and walk for a full eight hour day. (See Tr. 427) Plaintiff also testified that he tried to "fill out job searches and stuff and [his] arms go numb on [him]." (See Tr. 449).

Plaintiff's disability report, including his work history and educational history, was

---

[7]Plaintiff was treated at the VA Hospital in mid-August 2001 for first degree burns on his right chest and abdomen, either from cooking macaroni or spilling hot tea; Dr. Chicarelli observed the burns during his examination on August 22, 2001. (Tr. 246, 253, 423).

[8]See note 7 supra.

AO 72A
(Rev. 8/82)

reviewed by vocational expert Courtney Olds.  (See Tr. 461-63).  Dr. Olds concluded that if plaintiff has no limitations on sitting, standing and walking, but is limited in repetitive use of his hands and lifting more than five pounds, then he would be prevented from doing his past work which was classified at the medium exertional level.  (See Tr. 464).  However, Dr. Olds also opined that plaintiff is able to do certain other jobs, such as a security officer, a parking lot attendant and possibly a light driving job.  (See Tr. 465-66).  Plaintiff testified that he does drive a car but after an hour of driving his hands will go numb; "what happens is that I'll just pull over to the side of the road . . . [for] about fifteen minutes."  (See Tr. 441-42, 469).  Dr. Olds agreed that if plaintiff were incapable of using his right hand, the light driving job would be unsuitable.  (See Tr. 467).  Regarding a job as a parking lot attendant, Dr. Olds testified that there may be some difficulty for plaintiff if he could not use a cash register at all and if he had to park manual transmission cars.  (See Tr. 470-72).[9]

With respect to the security officer job, Dr. Olds envisioned "an entry level job" that "doesn't really involve use of the upper extremities," with limited "walking around," but rather merely "being a presence, maybe checking people in and out of a building or observing at a location."  (See Tr. 465-66, 472-76).  He testified that there are 1,200 of such jobs in Connecticut and 75,000 in the national economy.  (Id.).  In response to questioning by the ALJ on plaintiff's specific limitations, Dr. Olds indicated that the security job "might, occasionally, involve some writing – not a great deal of writing," possibly ten to fifteen minutes worth of writing.  (See Tr. 467).  Dr. Olds acknowledged, "[I]f he couldn't use his right hand, at all, that would be a problem working in that job."  (Id.).  When plaintiff was questioned by the ALJ immediately thereafter, he responded that he cannot write "for very long," only a few minutes, "enough to write out . . . my bills."  (See Tr. 468).

---

[9]Despite this testimony, the ALJ nonetheless found that plaintiff would be employed as a parking lot attendant.  (See Tr. 20 & 21).

8

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  The court first must decide whether the Commissioner applied the correct legal principles in making the determination.   Next, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  "Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more that a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).   The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).  The court must scrutinize the entire record to determine the reasonableness of the ALJ's findings.  Furthermore, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)(quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).   "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

9

A number of factors are considered and a five-step process is followed when deciding whether a claimant is disabled. First, the court determines whether the claimant is engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a). If the claimant is performing substantial gainful activity, the claim will be disallowed. See 20 C.F.R. § 404.1520(b). If the claimant is not working, then the second step requires that a finding be made as to the existence of a severe mental or physical impairment; if none exist, the claim is denied. See 20 C.F.R. § 404.1520(c). If the claimant has a severe impairment, the third step is to compare the claimant's impairment with those in the Listing. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listing, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal a listed impairment, then the fourth step is to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(e). If the claimant cannot perform his former work, then the fifth step is to show that he is prevented from doing any other work; disability benefits can only be received if a claimant cannot perform any alternate gainful employment. See Balsamo, 142 F.3d at 80 (citations omitted).

The initial burden of establishing disability is on the claimant. See 42 U.S.C. § 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy. See Balsamo, 142 F.3d at 80 (citations omitted). This may require application of the Medical-Vocational Guidelines ["the Grid"]; the Grid classifies employment into five groups based on exertional requirements of the different types of work, i.e., sedentary, light, medium, heavy and very heavy. See Gray v. Chater, 903 F. Supp. 293, 297-98 n.5 (N.D.N.Y. 1995). These

categories are based on strength requirements of such activities as sitting, walking, standing, lifting, carrying, pushing, and pulling.  See id.  The Grid places claimants with severe exertional impairments who can no longer perform past work into Grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled.  See id. at 298.  When the Commissioner makes a determination as to a claimant's disability, she must explain what physical functions the claimant is capable of performing; "in order to sustain her burden of showing that the claimant can perform sedentary work, the [Commissioner] must proffer specific medical evidence that the plaintiff can meet the exertional demands necessary to maintain sedentary work."  Mitchell v. Chater, 918 F. Supp. 675, 682 (W.D.N.Y. 1995)(citations omitted).

The Grid covers only exertional impairments; non-exertional impairments, including pain and psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  The Grid, which is generally dispositive on the issue of disability, is not dispositive in cases where it does not accurately represent a claimant's limitations because the claimant suffers from non-exertional limitations that substantially limit his capacity to work.  Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996).  If the Grid cannot be used, i.e., when non-exertional impairments are present, or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding of residual functional capacity for substantial gainful activity.  See id., 94 F.3d at 39 (citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

In determining whether or not a claimant is disabled, the Commissioner considers: (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) the claimant's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him; and (4) the claimant's age, educational background, and work history.  See Carroll v. Secretary of HHS, 705 F.2d 638,

11